## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| NYRA JEAN MILLER-FIELDS, individually and as Personal Representative of the Estate of Ricky Cobb, II, | Case No. 24-CV-1372 (NEB/TNL) |
| Plaintiff, | ORDER ON RYAN LONDREGAN'S MOTION TO DISMISS |
| v. | |
| RYAN LONDREGAN and BRETT SEIDE, | |
| Defendants. | |

Minnesota State Troopers Brett Seide and Ryan Londregan took part in a traffic stop that led to the fatal shooting of Ricky Cobb, II. The personal representative of Cobb's estate sued Seide and Londregan, asserting claims of unreasonable seizure and use of excessive force. Londregan now moves to dismiss the claims against him. For the reasons below, Londregan's motion to dismiss (ECF No. 28) is granted.

### BACKGROUND[1]

Around 1:52 a.m. on July 31, 2023, Minnesota State Trooper Brett Seide pulled over Ricky Cobb on Interstate 94 in Minneapolis for driving at night without his headlights

---

[1] The Court takes all factual allegations in the complaint as true on a motion to dismiss, *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014), but is not obligated "to accept a version of events that is 'blatantly contradicted by the record.'" *Ching ex rel. Jordan v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023) (citation omitted). In support of his

on. (Compl. ¶¶ 8, 11; Ex. 2 at 1:52:00.) Seide spoke with Cobb, who remained in his car. (Compl. ¶ 10.) Trooper Garrett Erickson[2] arrived on scene around 1:53 a.m., (Ex. 3 at 1:53:36), and Seide returned to his squad car. (Compl. ¶ 10.)

Seide was then alerted to a protection order involving Cobb. (*See* Compl. ¶ 13; Ex. 2 at 1:59:06–26 (reading aloud from his in-car computer, "Information alert, attempt to locate . . . wanted for felony OFP violation. If locate, hold subject and contact Ramsey County Sheriff's Office" ("RCSO").) Seide discussed the situation with Erickson. (Compl. ¶ 12; *see* Ex. 2 at 2:00:46–2:01:00.) Seide then radioed dispatch and asked them to contact the RCSO to determine how they wanted them to handle the alert. (Compl. ¶ 14; Ex. 2 at 2:02:05–14.) Two minutes later, dispatch radioed Seide that a sergeant would contact him "shortly." (Ex. 2 at 2:04:35–44.)

_____

motion, Londregan submits the body camera and squad car videos from Seide, Londregan, and Erickson that recorded the material events. (ECF Nos. 32–33 (Hennen Decl. Exs. 1–6, filed conventionally and under seal).) Although Miller-Fields objects to their consideration, she does not challenge their authenticity or completeness, and cites them in her response brief. The Court will consider these video recordings because they are "necessarily embraced by the pleadings." *Ching*, 73 F.4th at 621; *see Crow v. Rasmussen*, No. 23-CV-2403 (KMM/TNL), 2024 WL 2014211, at *3 (D. Minn. May 7, 2024) ("Where their authenticity and completeness are not in dispute, the Eighth Circuit and courts from this District have routinely held that body-worn videos like the ones here are 'embraced by the pleadings' and proper to consider on a motion to dismiss." (collecting cases)). The video exhibits are cited as "Ex. _." The Court also notes that the videos are time-stamped, and there is a slight difference in their time stamp appearing to be approximately one-tenth of one second off. The Court considered this slight difference when viewing the videos.

[2] The complaint refers to a "Trooper Doe." (*E.g.*, Compl. ¶ 12.) The parties agree and the video recordings confirm that "Trooper Doe" is Erickson.

Trooper Ryan Londregan arrived on scene around 2:11 a.m. (Compl. ¶ 8.) After Londregan arrived, Seide told Londregan that Cobb was wanted for a felony order of protection ("OFP") violation in Ramsey County and that Cobb was "a little sketchy." (*Id.* ¶ 13; Ex. 1 at 2:11:52–57; Ex 2 at 2:11:53–58.) Londregan asked if Cobb "was amped," and Seide agreed that he was. (Ex. 2 at 2:12:08–10.) Londregan asked, "Why? He knows he's subject of . . ."; Seide interjected, "Well no, he's just been having a rough night . . . ." (*Id.* at 2:12:13–16.) Seide explained that he was waiting for RCSO to tell him what they wanted him to do about Cobb, and that he did not want to arrest Cobb or use force without hearing from RCSO. (Compl. ¶ 14; Ex. 2 at 2:12:32–58.) Londregan noted that the alert "says hold, but still, go ahead, yeah." (Ex. 6 at 2:12:58–2:13:00.) Seide received a call from the RCSO, after which he told the other troopers that Ramsey County wanted Cobb arrested and brought to jail. (Compl. ¶ 16; Ex. 2 at 2:13:01–48.)

After a brief discussion between the troopers, Seide approached the driver side of Cobb's car, Londregan approached the passenger side, and Erickson stood near the back-left of the vehicle. (Compl. ¶ 17.) As the troopers approached, Cobb's car was in park with its doors locked and the front windows down. (*Id.* ¶ 18.) Seide repeatedly asked Cobb to step out of the vehicle because they had "some stuff to talk about" regarding Ramsey County. (*Id.* ¶¶ 19–24; Ex. 2 at 2:15:45–2:16:49.) Cobb asked if Seide was talking about "that sh*t with Terry Young." (Ex. 2 at 2:16:13–15.) Seide also repeatedly asked Cobb to hand him the keys to the car. (*Id.* at 2:16:07–37.) Cobb did not exit the car or give

3

Seide the car keys; instead, he repeatedly asked "why" and twice stated that he would call his attorney. (Compl. ¶¶ 19–24; Ex. 2 at 2:15:53–2:16:56.) At one point, Cobb asked if there was a warrant for his arrest; Seide confirmed there was no warrant. (Compl. ¶ 21; Ex. 2 at 2:16:15–18.) During this exchange, Cobb's hands were in the air in full view of the troopers as he gestured while talking and his car remained in park. (Compl. ¶ 25.)

After several unheeded orders for Cobb to get out of the car, Seide said, "this is now a lawful arrest." (*Id.* ¶ 24; Ex. 2 at 2:16:56–59.) What happened next occurred in mere seconds, and it took this Court many views of the videos in slow-motion to determine the order of events.

As Seide said the word "arrest," Londregan, still at the passenger side across from Cobb and Seide, moved his hand inside the passenger door, unlocked the car doors, and began opening the passenger-side door. (Compl. ¶ 27; Ex. 2 at 2:16:57–59; Ex. 5 at 2:16:58–2:17:00.) As Seide opened Cobb's driver-side door, Cobb placed his foot on the brake, moved his hand to the transmission shift, and shifted the car into drive. (Compl. ¶¶ 28–29; Ex. 2 at 2:16:59–2:17:03; Ex. 5 at 2:17:01–03.)

Cobb's car moved forward; Seide and Londregan moved with it. (Compl. ¶ 30; Ex. 1 at 2:16:59–2:17:03; Ex. 3 at 2:17:00–01.) Seide leaned inside the car and reached over Cobb toward his seatbelt buckle, in an attempt to remove Cobb from the car. (Compl. ¶ 31; Ex. 3 at 2:17:02–05; Ex. 5 at 2:17:03–04.) Seide was leaning at least half-way inside the car to accomplish this motion. (Ex. 3 at 2:17:02–05.) Cobb then stepped on the brake,

stopping the vehicle's forward movement. (Compl. ¶ 32; Ex. 1 at 2:17:00–02; Ex. 3 at 2:17:02–03 (brake lights).)

Then the car began moving again, and Londregan pulled his firearm, pointed it at Cobb, and shouted, "Get out of the car now!" (Compl. ¶¶ 32, 34–35; Ex. 1 at 2:17:01–04 (no brake lights when Londregan shouts); Ex. 3 at 2:17:03–04 (same); Ex. 5 at 2:17:03–04.) While Londregan was shouting, Seide was still leaning inside the car trying to reach Cobb's seatbelt, as Cobb took his foot off the brake and the car began moving forward. (Compl. ¶ 35; Ex. 1 at 2:17:02–04; Ex. 3 at 2:17:03–04; Ex. 5 at 2:17:04–05.)

Londregan's body-worn camera video shows that Cobb raised his right hand from the gear shift.[3] (Ex. 5 at 2:17:05.) Within tenths of a second after Londregan yelled the word "now," he fired his handgun twice at Cobb's torso, striking him twice. (Compl. ¶ 35; Ex. 1 at 2:17:03–04 (gunshots heard, brake lights off); Ex. 5 at 2:17:04–05.) The car was moving when Londregan shot Cobb.

After Londregan shot Cobb, Cobb's vehicle began to accelerate with Seide still partially inside the car. (Compl. ¶ 36; Ex. 1 at 2:17:04–05; Ex. 3 at 2:17:04–05.) Seide was dragged for a moment before he and Londregan fell away from the car. (Compl. ¶ 37;

---

[3] Londregan asserts that Cobb "attempted to grab his gun." (ECF No. 31 at 7 (citing Ex. 5 at 2:17:05).) Cobb raised his arm from the gear shift, but to the Court's eye, Londregan's body camera video does not confirm that he attempted to grab the gun, so the Court will not consider Londregan's assertion on this point. *See Abdullah v. Lepinski*, No. 23-cv-121 (ECT/DTS), 2023 WL 5515895, at *2 (D. Minn. Aug. 25, 2023) ("Inconclusive video evidence must be construed in the plaintiff's favor.").

Ex. 1 at 2:17:04–08; Ex. 3 at 2:17:05–06; *see* Ex. 2 at 2:17:20–21 (Seide saying that he "got f***ing dragged").) Cobb's car continued onto Interstate 94. (Compl. ¶ 38; Ex. 1 at 2:17:06–16.) The troopers ran to their squad cars and followed Cobb's car, which traveled about one-quarter mile down the interstate and slowed to a stop next to the median. (Compl. ¶ 39; Ex. 1 at 2:17:17–2:18:08.)

The troopers caught up with Cobb and decelerated. Seide's squad car hit the rear-passenger side of Cobb's slowly moving car. (Ex. 1 at 2:18:07–08.) Londregan hit Cobb's car in the front passenger side. (*Id.* at 2:18:08.) Defendants and others pulled Cobb from the car and attempted life-saving measures, without success. (Compl. ¶ 40.)

Nyra Jean Miller-Fields, individually and as personal representative of Cobb's estate, sued Seide and Londregan, alleging claims under 42 U.S.C. Section 1983 for unreasonable seizure and use of excessive force in violation of the Fourth and Fourteenth Amendments.[4] Londregan moves to dismiss the claims against him on the grounds of qualified immunity and failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

[4] Only the Fourth Amendment applies here because Cobb was shot and killed, and so there was a "seizure." *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[*A*]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").

## ANALYSIS

### I.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the Court must accept as true all plausible factual allegations and draw all reasonable inferences for the non-moving party. *Smithrud*, 746 F.3d at 397. The Court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). And the Court will not accept "the plaintiff's version of the facts if they are 'blatantly contradicted' by video evidence." *Id.* (citation omitted, cleaned up). Inconclusive video evidence can be considered on a motion to dismiss as embraced by the pleadings, and it will be construed in the plaintiff's favor. *Ching*, 73 F.4th at 621; *Abdullah*, 2023 WL 5515895, at *2.

### II.    Qualified Immunity

Londregan seeks dismissal of the unlawful seizure and excessive force claims against him on the grounds of qualified immunity.[5] Qualified immunity provides some protection against suits for civil damages against government officials. *See Harlow v.*

---

[5] Londregan also seeks qualified immunity for claims involving actions he did not take, citing allegations about Seide's conduct. (ECF No. 31 at 10–11 (citing Compl. ¶¶ 11, 21–23, 31, 33, 35, 40, 57(a)–(c), (g)).) A defendant can only be held liable under Section 1983 for his own conduct. *See White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017) ("To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation."). Because Section 1983 liability is personal, *White*, 865 F.3d at 1081, Londregan cannot be held liable for Seide's actions. Any claims against Londregan for Seide's actions will be dismissed.

*Fitzgerald*, 457 U.S. 800, 818 (1982). In a Section 1983 action, "an officer is entitled to qualified immunity unless: (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established." *Ching*, 73 F.4th at 620. To be a clearly established right, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1255 (8th Cir. 2023) (citation omitted). Miller-Fields need not identify "a case directly on point," but "controlling authority or a robust consensus of persuasive authority must put the constitutional question 'beyond debate.'" *Id.* (citation omitted). The "salient question" is whether the law at the time of the alleged violation gave Londregan "fair warning" that his conduct was unconstitutional. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

## A.    *Unreasonable Seizure*

Miller-Fields asserts that Londregan unreasonably seized Cobb when he: (1) assisted Seide in arresting Cobb; (2) opened Cobb's passenger door and leaned into the car to remove him; (3) pointed his firearm at Cobb; (4) fatally shot Cobb; and (5) hit Cobb's car with his squad car.[6] (Compl. ¶ 57(d)–(g); ECF No. 57 at 16.) The Court will

---

[6] There was some dispute at the hearing about whether Miller-Fields pled a claim based on Londregan hitting Cobb's car after the shooting. Miller-Fields' brief acknowledged that while "both Defendants had rammed their squad cars into [Cobb's] vehicle," the "ramming" claim is pled only for Seide. (ECF No. 57 at 7, 12–13.) The complaint alleges that Seide's squad car rammed Cobb's car; the videos show that Seide's and Londregan's squad cars both hit Cobb's car. (*Compare* Compl. ¶¶ 40, 78, 80, *with* Ex. 1 at 2:18:06–08; Ex. 6 at 2:18:09.) At the hearing Miller-Fields' counsel argued that the "ramming" allegation against Londregan is covered in the complaint by paragraph 57(g), so the Court will consider whether this action constituted an unreasonable seizure.

address each of these actions under the law of unreasonable seizures first, except for the

fatal shooting, which it will address with the excessive force claim. *See Sanders v. City of*

*Minneapolis*, 474 F.3d 523, 526 (8th Cir. 2007).

To establish a Fourth Amendment violation, Miller-Fields must show that "a

seizure occurred and that the seizure was unreasonable." *Dundon*, 85 F.4th at 1255. "Once

the predicate facts are established, the reasonableness of the official's conduct under the

circumstances is a question of law." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th

Cir. 2009) (citation omitted)).

To assess the reasonableness of an officer's conduct, the Court considers the

totality of the circumstances and factors including "the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and

whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight,"

as well as the result of the force. *Id.* (citation omitted). The Court determines the

reasonableness of an officer's conduct from the "perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight," with "allowance for the fact that

police officers are often forced to make split-second judgments—in circumstances that

are tense, uncertain, and rapidly evolving—about the amount of force that is necessary

in a particular situation." *Id.* (citing *Graham*, 490 U.S. at 396–97).

*Assisting with warrantless arrest*. The first unreasonable seizure, according to Miller-

Fields, is Londregan's assistance in the arrest. (ECF No. 57 at 16.) "A warrantless arrest is

consistent with the Fourth Amendment if it is supported by probable cause" that a crime has been committed, and "an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (citation omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Just v. City of St. Louis*, 7 F.4th 761, 767 (8th Cir. 2021) (citation omitted). Officers are afforded "substantial latitude in interpreting and drawing inferences from factual circumstances," and "where the officers act on a mistaken belief that probable cause exists, if that mistake is 'objectively reasonable,' arguable probable cause exists and the officers are entitled to qualified immunity." *Id.* (citations omitted). The existence of probable cause, and arguable probable cause, are questions of law determined at the time of the arrest, and later-developed facts are irrelevant to the analysis. *Hosea v. City of St. Paul*, 867 F.3d 949, 955, 956 (8th Cir. 2017).

It was not unreasonable for Londregan to rely on Seide, who in turn relied on RCSO's probable cause determination. Indeed, the complaint acknowledges that Londregan and Seide at least had reasonable suspicion that Cobb had an OFP violation. (Compl. ¶ 62 ("Neither Defendant Londregan nor Defendant Seide had reasonable suspicion that Decedent Cobb had committed any crime *other than a protective order violation*." (emphasis added).) The complaint also recognizes that Seide told Londregan that "Ramsey County wanted Decedent Cobb arrested and brought to jail." (Compl.

¶ 16.) Video recordings confirm that Seide told Londregan that Cobb was "the guy they want for *felony* OFP violation."[7] (Ex. 1 at 2:11:52–56 (emphasis added); Ex 2 at 2:11:53–57 (same).) A protection-order alert sounded repeatedly in Londregan's squad car, and Londregan noted to Seide that the alert specified to "hold" Cobb. (Ex. 6 at 2:12:36–49, 2:12:58–2:13:00.) The videos show that Seide was the arresting officer, and that Londregan and Erickson were assisting him.

And, Minnesota's Domestic Abuse Act seems to mandate the arrest: it provides that "[a] peace officer *shall* arrest without a warrant and take into custody a person whom the peace officer has probable cause to believe has violated an order [of protection] granted pursuant to this section . . . ." Minn. Stat. § 518B.01, subdiv. 14(e) (emphasis added).

To be sure, that same statute also authorizes arrest only if the officer has "probable cause that the person *knows* of the existence of the order." *Id.* (emphasis added). Miller-Fields argues that Londregan did not have probable cause to believe that Cobb had knowledge of the OFP. As evidence for this proposition, she notes that Cobb repeatedly asked Seide "why" he was asked to get out of his car.

---

[7] Under Minnesota's Domestic Abuse Act, a person who violates an OFP is guilty of a felony if the person violates the Act:

     (1) within ten years of the first of two or more previous qualified domestic
     violence-related offense convictions or adjudications of delinquency; or
     (2) while possessing a dangerous weapon . . . .

Minn. Stat. § 518B.01, subdiv. 14(d).

The Court finds this argument irrelevant as to Londregan, because he was reasonably relying upon the determination of other officers. "Generally, an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable." *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1010 (8th Cir. 2017) (citation omitted). Seide, with Londregan standing by, received the call from Ramsey County, after which Seide told the troopers that Ramsey County wanted them to arrest Cobb. (Ex. 2 at 2:12:13–2:12:58, 2:13:01—2:13:48; Compl. ¶ 16.) Londregan's reliance on other officers' probable-cause determination—which was supported by his understanding that the RCSO was asking for Cobb to be held—was reasonable. *See Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (en banc) (holding that an officer assigned to operate a battering ram "had no constitutional duty to verify" the supervising officer's decision to execute a no-knock entry based on "the settled principle that law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable"). Even if Londregan was "mistaken that probable cause existed, that mistake was 'objectively reasonable' and arguable probable cause exists, entitling [him] to qualified immunity." *Just*, 7 F.4th at 768.

*Opening Cobb's car door and leaning in*. The second unreasonable seizure alleged is that when Seide was telling Cobb that he was under arrest, "Londregan moved his hand into the inside of the passenger door, unlocked the vehicle's doors, and began opening

the passenger-side door." (Compl. ¶ 27.) Londregan opened the door and leaned his torso

inside the car, (*id.* ¶ 34), allegedly "to forcibly remove" Cobb from the car. (*Id.* ¶ 57(d).)

As for opening Cobb's car door, "[a] person is seized within the meaning of the

Fourth Amendment 'when the officer, by means of physical force or show of authority,

terminates or restrains [the person's] freedom of movement.'" *Torres v. City of St. Louis*,

39 F.4th 494, 505 (8th Cir. 2022) (citation omitted). The videos show that Londregan did

not touch Cobb before the shooting. And Cobb's shifting the car gear into drive shows

that Cobb did not submit to the troopers' show of authority. "[B]ecause there was no

application of physical force or acquiescence to a show of authority," *id.* at 506,

Londregan opening the car door is not a seizure for purposes of the Fourth Amendment.

As for leaning into the car to forcibly remove Cobb, officers may use reasonable

force to remove a driver who disregards orders to exit a car, particularly where they are

affecting a lawful arrest. *See Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011)

("Police officers undoubtedly have a right to use some degree of physical force, or threat

thereof, to effect a lawful seizure."); *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082

(8th Cir. 1990) (concluding that an officer's use of force to pull a suspect from his car and

handcuff him was reasonable after he resisted the request to get out of a car). Londregan's

conduct was reasonable.[8]

---

[8] The complaint alleges that Londregan knew that attempting to place parts of his body
inside Cobb's moving car violated state trooper policy. (Compl. ¶ 61.) To the extent that
leaning into a car violates policy, "[a]cting contrary to training does not itself negate

*Pointing a firearm at Cobb.* The complaint alleges that "drawing a deadly weapon on Decedent Cobb to seize him without probable cause when there was no indication he was posing any threat of danger to the officers" was unreasonable. (Compl. ¶ 57(e); *see id.* ¶¶ 32, 34.)

To begin, the video recordings soundly refute Miller-Fields' assertion that there was "no indication" that Cobb posed a threat of danger to the troopers. Cobb refused Seide's repeated requests to get out of the car or give Seide the car keys. When Seide told Cobb he was under arrest, Cobb shifted his car out of park and into drive, and the car began to move. "[D]angerous circumstances surrounding a person's attempt to flee from law enforcement are compounded by the person's operation of a motor vehicle . . . . As a person is in flight from custody, his vehicle has the potential to become a deadly or dangerous weapon." *United States v. Kendrick*, 423 F.3d 803, 809 (8th Cir. 2005) (affirming district court's determination that fleeing from police officer in motor vehicle was crime of violence for sentencing purposes). Given the "stress and urgency" naturally present in such a situation, a person fleeing "will likely drive recklessly and turn any pursuit into a

_____

qualified immunity so long as a reasonable officer could have believed that his conduct was justified." *Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020) (cleaned up, citation omitted). Miller-Fields acknowledges as much, explaining that her allegations about policy merely provide context and are to be considered under the totality of the circumstances. (ECF No. 57 at 14–15); *see Walton v. Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2014) ("[V]iolating an internal policy does not *ipso facto* violate the Constitution, but when that policy equates to the constitutional minimum under the totality of the circumstances, we appropriately focus on the objectively unconstitutional conduct which breaches the policy.").

high-speed chase with the potential for serious harm to police or innocent bystanders." *Id.* (citation omitted).

Even if Cobb were not actively attempting to flee in his car, the situation was not in control when Londregan pointed his weapon at Cobb. Consider the totality of the circumstances presented to Londregan: Cobb repeatedly refused to comply with officer instructions; Cobb shifted the car into drive; the car began moving with Seide leaning inside the car; and the incident was on a busy highway with fast-moving traffic. Under these circumstances, drawing the gun did not violate the Fourth Amendment. *See, e.g., Clark v. Clark*, 926 F.3d 972, 979 (8th Cir. 2019) (holding pointing a gun at a suspect while removing him from a vehicle did not violate Fourth Amendment where "[a] reasonable officer was justified in believing the situation was not fully under control until [the suspect] had been removed from the vehicle, patted down, and restrained"). Londregan drew his weapon only after (1) Seide told Cobb that he was being arrested and (2) Cobb shifted the car out of park. Londregan's decision to draw his weapon at that time was objectively reasonable.

*"Ramming" Cobb's car*. The complaint alleges that Defendants unreasonably seized Cobb by "ramming" his stopped car after the shooting. (Compl. ¶ 57(g); *see id.* ¶ 80 ("Seide rammed Decedent Cobb's stationary vehicle with his squad car").) The videos demonstrate no such "ramming." Instead, they show that Londregan's squad decelerated

as it approached Cobb's slowly moving car and bumped it to a stop. (Ex. 1 at 2:17:58–2:18:10; Ex. 6 at 2:18:06–10.)

Courts have found no violation of Fourth Amendment rights where officers used squad cars to hit a suspect's vehicle and box him in, because a reasonable officer could have believed that the suspect was fleeing from officers and threatened others' safety unless the suspect was stopped. *See, e.g., Jackson v. Brooklyn Ctr.*, No. 21-CV-2072 (SRN/DJF), 2023 WL 2368032, at *11 (D. Minn. Mar. 6, 2023), *aff'd*, No. 23-1678, 2023 WL 6876550 (8th Cir. Sept. 28, 2023); *Nunn v. City of Woodbury*, No. 05-CV-632 (ADM/JSM), 2006 WL 3759748, at *8 (D. Minn. Dec. 21, 2006) ("In the totality of the circumstances, [the officer's] actions of ending the pursuit by pushing [the suspect's] car into a snow bank after hitting [the suspect's] almost-stopped car with his squad car traveling approximately twenty miles per hour was objectively reasonable."). At the time Londregan's squad hit Cobb's car, Londregan had at least arguable probable cause to arrest Cobb for the felony OFP violation, as well as for resisting arrest, Minn. Stat. § 609.50, subdiv. 1(1)–(2), and for fleeing arrest in a motor vehicle. Minn. Stat. § 609.487, subdiv. 3. In addition, given the close-range gun shots, it is reasonable to infer that Londregan knew Cobb was wounded, so Cobb's continued driving could be a danger to himself or the public. (*See* Compl. ¶ 78 (alleging that Seide rammed Cobb's car "despite . . . Cobb's gunshot wounds").)

Because Londregan's conduct did not violate a constitutional right, he is entitled to qualified immunity on these unreasonable seizure claims. Absent a constitutional violation, the Court does not address Miller-Fields' "clearly established" arguments on unreasonable seizure.

### B.    *Excessive Force*

Miller-Fields also asserts an excessive force claim against Londregan for the shooting—*i.e.*, his use of deadly force. "Claims that an officer seized a person with excessive force 'are properly analyzed under the Fourth Amendment's objective reasonableness standard.'" *Arnold v. McClinton*, 112 F.4th 598, 602 (8th Cir. 2024) (citing *Wallace v. City of Alexander*, 843 F.3d 763, 768 (8th Cir. 2016)). Deadly force is reasonable "only if the officer had probable cause to believe the suspect presented 'a threat of serious physical harm to the officer or others.'" *Ching*, 73 F.4th at 620 (citing *Partridge v. City of Benton*, 929 F.3d 562, 565 (8th Cir. 2019)). In determining whether the use of deadly force was objectively reasonable, courts consider the totality of the circumstances, including "the severity of the crime at issue," "whether the suspect is actively fleeing or resisting arrest," and "whether the suspect poses an immediate threat to the safety of the officer or others." *Arnold*, 112 F.4th at 603 (citing *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)); *see Graham*, 490 U.S. at 396.

The complaint alleges that "Cobb was an unarmed man stopped for a minor traffic violation, had no outstanding warrants, and was not threatening or acting violently

towards the officers on scene. Nevertheless, . . . Londregan drew his firearm on Decedent

Cobb and shot him almost immediately." (Compl. ¶ 77; *see also id.* ¶¶ 57(e)–(f) (alleging

unlawful seizure based on similar factual allegations).) It also alleges that Seide and

Londregan did not attempt any de-escalation techniques or attempt to determine

whether Cobb was armed or posed any danger to himself or others before Londregan

shot him. (*Id.*¶¶ 79–80.)

The video recordings establish a different fact pattern, and all the factors

articulated by the Eighth Circuit were present at the scene—severity of the crime, active

fleeing or resisting arrest, and immediate threat to safety of officers or others.

First, Cobb's initial traffic stop was for a minor traffic violation. But by the time of

Londregan's encounter with Cobb, it was not a traffic stop: it was an arrest based on

Cobb's alleged felony OFP violation, which mandates arrest under Minnesota law. The

situation was thus far more serious than a traffic stop.

Second, Cobb ignored Seide's repeated requests for him to exit the car and give up

the car keys—an uncooperative response to Seide's attempts to de-escalate the situation.

The videos show that when Seide told Cobb that he was under arrest, Cobb took steps

that an officer would reasonably believe to be an attempt to flee: he shifted his car from

park into drive and the car began moving forward. Cobb was not "unarmed" because

once he shifted the car into drive and the car began moving in response to being arrested,

Cobb could use his vehicle as a dangerous weapon. *See Kendrick*, 423 F.3d at 809 ("As a

person is in flight from custody, his vehicle has the potential to become a deadly or dangerous weapon."); *see also United States v. Yates*, 304 F.3d 818, 823 (8th Cir. 2002) (concluding that accelerating a vehicle toward marshals trying to arrest the defendant was assault with a dangerous weapon, not simple assault).

Miller-Fields argues that Cobb was not "physically resisting arrest," and that Cobb did not shift the car into drive until Londregan opened his passenger door. (ECF No. 57 at 25.) The Court thinks otherwise; fleeing an arrest in a motor vehicle can certainly be characterized as "physical resistance" to arrest. Cobb took action to flee the scene immediately after Seide told him that he was executing a lawful arrest. The troopers were not required to read Cobb's motivations for shifting the car into drive. *See Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018) ("Law enforcement officers are not required to read a suspect's motivations in failing to obey commands—it is enough that the officer reasonably perceives that the suspect is not following orders as given.").

Third and finally, the videos show that Cobb's car was moving—with Seide leaning at least half-way inside the car—when Londregan shouted for Cobb to get out of the car and then fired his weapon. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1105 (8th Cir. 2004) (citing *Graham*, 490 U.S. at 396–97). "[I]t was objectively

reasonable for [Londregan] to believe that [Seide] was in immediate danger, as he faced the possibility that [Seide] could be dragged down the road . . . if the vehicle began to move."[9] *Id.* The highway was a busy one, and other vehicles were driving by, increasing the threat of severe injury to Seide if he were to be dragged and fall from the car onto the highway. *See Harmon v. City of Arlington*, 16 F.4th 1159, 1164 (5th Cir. 2021) ("Common sense confirms that falling off a moving car onto the street can result in serious physical injuries."). Judging the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Lawyer*, 361 F.3d at 1105 (citation omitted), the Court concludes that Londregan was reasonable in firing his weapon.[10]

Miller-Fields argues that Cobb was not fleeing, but rather was startled by Londregan's entry into the car, causing his foot to move off the brake. This again is contravened by the video evidence, which shows Cobb placing the car in drive with his

---

[9] In *Lawyer v. City of Council Bluffs*, an officer pulled over a driver for speeding and, when the officer ordered the driver out of the vehicle to sign the citation, the driver refused. 361 F.3d at 1105. The officer tried to open the door, but found it locked, and the driver ignored requests to unlock the door. *Id.* The officer reached inside the vehicle through the open window to unlock the door, and the window began to roll up. *Id.* The Eighth Circuit held that the officer was reasonable in using pepper spray on the driver to induce the driver to roll down the window and unlock the door, even though the vehicle did not move. *Id.*

[10] The complaint quotes an interview of a Minnesota State Patrol use-of-force trainer attended by agents of the Minnesota Bureau of Apprehension. (*See* Compl. ¶¶ 47–49.) Londregan provides a transcript of the interview, asserting that the Court may consider it because it is embraced by the pleadings. (ECF No. 32-1 (Ex. 7).) The Court agrees, but finds the complaint allegations and the interview unhelpful because the trainer did not address the specific fact scenario faced by Defendants.

hand. And even if Cobb "actually posed no danger," the Court is to consider "*objective reasonableness based on the circumstances at the time.*" *Ransom v. Grisafe*, 790 F.3d 804, 812 (8th Cir. 2015). It was objectively reasonable for an officer to use deadly force to neutralize what he reasonably believed was a risk of serious physical harm to others, including a fellow officer. This Court will not "second-guess whether alternative actions by police officers 'might conceivably have been available.' 'The Constitution . . . requires only that the seizure be objectively reasonable, not that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight vision.'" *Est. of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) (citations omitted).

*Clearly established right.* Londregan is also entitled to qualified immunity because his conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. "An officer violates a clearly established right only if a reasonable officer in the same position would understand his conduct violates the right." *Ching*, 73 F.4th at 620. The Court "must not 'define clearly established law at a high level of generality.'" *Id.* (citation omitted). In determining whether Miller-Fields has identified a clearly established right, the Court "look[s] for a controlling case or 'a robust consensus of cases of persuasive authority'" that "involves sufficiently similar facts to squarely govern" the conduct at issue and places the question "beyond debate." *Id.* (citations omitted); *see Sok Kong Tr.*, 960 F.3d at 992 ("Use of excessive force is an area of the law in which the result depends very much

on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." (citation omitted)). "The plaintiff bears the burden of proving that the law was clearly established." *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013).

An established general principle guides this discussion: "An officer may not use deadly force against a fleeing suspect unless the suspect poses an immediate and significant threat of serious injury or death to the officer or to bystanders." *Thompson v. Murray*, 800 F.3d 979, 983 (8th Cir. 2015); *see id.* ("This general standard can be sufficient to clearly establish a fleeing suspect's rights in a case where they have obviously been infringed.").

The Eighth Circuit has not addressed this exact situation, but as set forth above, the Court concludes based on uncontroverted video evidence that Cobb posed an immediate and significant threat of serious injury or death to Seide or other motorists. Bolstering this conclusion are cases from the Fifth Circuit addressing similar circumstances. In *Harmon v. City of Arlington*, the Fifth Circuit considered a police officer who stepped onto the running board of an SUV at a traffic stop when the driver restarted the SUV. 16 F.4th at 1164. The officer reached into the SUV and yelled "hey stop"; the driver fired the ignition and shifted into drive. "[A]bout a second after the car lurched forward, [the officer] drew his pistol and shot [the driver] four times." *Id.* The Fifth Circuit concluded that the officer reasonably believed he was at risk of serious physical harm

when he was clinging to the accelerating SUV and drew his pistol, and so the use of deadly force was reasonable. *Id.* In *Barnes v. Felix*, the court held that the use of deadly force was reasonable because at the moment of threat, the officer was hanging onto the moving car and believed it would run him over, which "could have made [the officer] reasonably believe his life was in imminent danger." 91 F.4th 393, 397 (5th Cir. 2024) (quotation marks omitted).

Miller-Fields also contends that Londregan's use of deadly force against Cobb without providing an adequate warning was a clearly established violation of his Fourth Amendment rights. (ECF No. 57 at 31 (citing *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)), 32.) "[A]n officer should give 'some warning' when it is 'feasible' to do so." *Morgan-Tyra v. City of St. Louis*, 89 F.4th 1082, 1086 (8th Cir. 2024) (citing *Loch*, 689 F.3d at 967); *see Garner*, 471 U.S. at 11–12 (holding that deadly force may be used if necessary to prevent escape of a suspect who has committed a crime involving the infliction or threatened infliction of serious physical harm "if, *where feasible*, some warning has been given" (emphasis added)). "Both common sense and our cases suggest that a warning is less likely to be 'feasible' in a high-pressure situation that requires a split-second judgment" like the one here. *Morgan-Tyra*, 89 F.4th at 1086. This was just such a high-pressure situation, given that the car was moving; it required a split-second judgment, and a warning was less likely to be feasible. *See id.* (holding that an officer's "split-second decision to shoot without warning . . . did not violate a *clearly established* right").

Under this case law, the Court cannot conclude that Londregan violated a clearly established right when he made the decision to shoot Cobb.

**CONCLUSION**

Based on the above and on all the files, records, and proceedings herein, Ryan Londregan's motion to dismiss (ECF No. 28) is GRANTED.

Dated: October 30, 2024                    BY THE COURT:

                                           s/Nancy E. Brasel
                                           Nancy E. Brasel
                                           United States District Judge