## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| NYRA JEAN MILLER-FIELDS, individually and as Personal Representative of the Estate of Ricky Cobb, II,<br><br>Plaintiff,<br><br>v.<br><br>RYAN LONDREGAN and BRETT SEIDE,<br><br>Defendants. | Case No. 24-CV-1372 (NEB/TNL)<br><br><br>ORDER ON BRETT SEIDE'S MOTION TO DISMISS |

Minnesota State Troopers Brett Seide and Ryan Londregan took part in a traffic stop that led to the fatal shooting of Ricky Cobb, II. The personal representative of Cobb's estate sued Seide and Londregan, asserting claims of unreasonable seizure and use of excessive force. Seide now moves to dismiss the claims against him. For the reasons below, Seide's motion to dismiss (ECF No. 61) is granted.

### BACKGROUND[1]

Around 1:52 a.m. on July 31, 2023, Minnesota State Trooper Brett Seide pulled over Ricky Cobb on Interstate 94 in Minneapolis for driving at night without his headlights

---

[1] The Court takes all factual allegations in the complaint as true on a motion to dismiss, *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014), but is not obligated "to accept a version of events that is 'blatantly contradicted by the record.'" *Ching ex rel. Jordan v. City of Minneapolis*, 73 F.4th 617, 621 (8th Cir. 2023) (citation omitted). In support of his

on. (ECF No. 1 ("Compl.") ¶¶ 8, 11; Ex. 2 at 1:52:00.) While following Cobb's car, Seide was alerted to a protection order involving Cobb. (Ex. 2 at 1:51:36–38.) After stopping Cobb, Seide spoke with him while Cobb remained in his car. (*Id.* at 1:52:21–31.) Seide asked Cobb for his license and proof of insurance, and told him that he was pulled over because he did not have his lights on. (*Id.*) Seide returned to his squad car around 1:58 a.m. (*Id.* at 1:58:49.)

Back in his squad car, Seide read the alert aloud from his in-car computer: "Information alert, attempt to locate . . . wanted for felony OFP violation. If locate, hold subject and contact Ramsey County Sheriff's Office" ("RCSO"). (Ex. 2 at 1:59:06–26.) Seide then confirmed Cobb's identification and briefly discussed the situation with Trooper Garrett Erickson[2], who had arrived on the scene. (Compl. ¶ 12; *see* Ex. 2 at 1:59:53–2:01:57; Ex. 3 at 1:53:36.) At 2:02 a.m., Seide radioed dispatch and asked them to contact RCSO to

---

motion, Seide relies on the body camera and squad car videos from Seide, Londregan, and Erickson that recorded the material events. (ECF Nos. 32–33 (Hennen Decl. Exs. 1–6, filed conventionally and under seal).) Although Miller-Fields objects to their consideration, she does not challenge their authenticity or completeness, and cites them in her response brief. The Court will consider these video recordings because they are "necessarily embraced by the pleadings." *Ching*, 73 F.4th at 620. The Court views undisputed video footage in the light depicted by the footage. *Scott v. Harris*, 550 U.S. 372, 381 (2007). The video exhibits are cited as "Ex. _." The Court also notes that the videos are time-stamped, and there is a slight difference in their time stamp appearing to be around one-tenth of one second off. The Court considered this slight difference when viewing the videos.

[2] The complaint refers to a "Trooper Doe." (*E.g.*, Compl. ¶ 12.) The parties agree and the video recordings confirm that "Trooper Doe" is Erickson.

determine how they wanted Seide to handle the alert. (Compl. ¶ 14; Ex. 2 at 2:02:05–14.) Two minutes later, dispatch radioed Seide that a sergeant would contact him "shortly." (Ex. 2 at 2:04:35–44.)

Trooper Ryan Londregan arrived on scene around 2:11 a.m. (Compl. ¶ 8.) After Londregan arrived, Seide told Londregan that Cobb was wanted for a felony order of protection ("OFP") violation in Ramsey County and that Cobb was "a little sketchy." (*Id.* ¶ 13; Ex. 1 at 2:11:52–57; Ex. 2 at 2:11:53–58.) Londregan asked if Cobb "was amped," and Seide agreed that he was. (Ex. 2 at 2:12:08–10.) Londregan asked, "Why? He knows he's subject of . . .", Seide interjected, "Well no, he's just been having a rough night . . . ." (*Id.* at 2:12:13–16.) Seide explained that he was waiting for RCSO to tell him what they wanted him to do about Cobb, and that he did not want to arrest Cobb or use force without hearing from RCSO. (Compl. ¶ 14; Ex. 2 at 2:12:32–58.) Londregan noted that the alert "says hold, but still, go ahead, yeah." (Ex. 6 at 2:12:58–2:13:00.)

Seide received a call from RCSO at 2:13 a.m. (Ex. 2 at 2:13:00.) The video evidence recorded only Seide's side of this call. (*See id.*) Seide explained to the caller that he had received a KOPS[3] alert, that he had just stopped the vehicle for having no lights on. (*Id.* at 2:13:02–17.) Seide continued:

> It's for a Ricky Thomas Cobb. I have him stopped, and he is in the vehicle.
> [pause (*id.* at 2:13:23–37)]

---

[3] It is the Court's understanding that KOPS is an acronym for Keeping Our Police Safe.

Alright, yeah. We'll, I'll, I'll get him arrest—we'll, we'll go out there. He's a little amped up, so we're gonna get him arrested. I want to help here, you know. We'll get him arrested, and then, what do you want to do for the transport and stuff? [pause]

Ok. Well, I can, I can, I can run—[pause]

Ramsey County Jail? I can do that. And then do you want me to meet a squad there? Or how do you want me to do booking? [pause]

Yeah, I can book him under felony OFP, I just don't know, maybe if I can get your guys's [*sic*] case number quick? [pause]

Yep. [pause]

0-3-9-0 [pause] 3-9. So I have 0, ah, 0-9, [pause]

0-3-9-0-3-9. Alright, I got that. And that's Ramsey County. Ok. Yep. We're gonna go, I'll go arrest him, and then I'll bring him to Ramsey County Jail, and then do you want me to book under that case number? Or do you want me to book under my own case number? [pause]

Ok. [pause]

Yep, yep. [pause]

Ok. Sounds good. We'll get it all figure out. [pause]

Alright. Yeah, no problem. Bye, bye.

(Ex. 2 at 2:13:17–15:07 (also showing Seide writing on paper when repeating the case number); Ex. 1 at 2:13:00–15:05.) After ending the call, Seide exited the squad car and told the other troopers that Ramsey County wanted Cobb arrested and brought to Ramsey County Jail. (Compl. ¶ 16; Ex. 2 at 2:15:13–26.)

After a brief discussion between the troopers, Seide approached the driver side of Cobb's car, Londregan approached the passenger side, and Erickson stood near the back-

left of the vehicle. (Compl. ¶ 17.) As the troopers approached, Cobb's car was in park with its doors locked and the front windows down. (*Id.* ¶ 18.) Seide repeatedly asked Cobb to step out of the vehicle because they had "some stuff to talk about" regarding Ramsey County. (*Id.* ¶¶ 19–24; Ex. 2 at 2:15:45–2:16:49.) Cobb asked if Seide was talking about "that sh*t with Terry Young." (Ex. 2 at 2:16:13–15.) Seide also repeatedly asked Cobb to hand him the keys to the car. (*Id.* at 2:16:07–37.) Cobb did not exit the car or give Seide the car keys; instead, he repeatedly asked "why" and twice stated that he would call his attorney. (Compl. ¶¶ 19–24; Ex. 2 at 2:15:53–2:16:56.) At one point, Cobb asked if there was a warrant for his arrest; Seide confirmed there was no warrant. (Compl. ¶ 21; Ex. 2 at 2:16:15–18.) During this exchange, Cobb's hands were in the air in full view of the troopers as he gestured while talking and his car remained in park. (Compl. ¶ 25.)

After several unheeded orders for Cobb to get out of the car, Seide said, "this is now a lawful arrest." (*Id.* ¶ 24; Ex. 2 at 2:16:56–59.) What happened next occurred in mere seconds, and it took this Court many views of the videos in slow-motion to determine the order of events.

As Seide said the word "arrest," Londregan, still at the passenger side across from Cobb and Seide, moved his hand inside the passenger door, unlocked the car doors, and began opening the passenger-side door. (Compl. ¶ 27; Ex. 2 at 2:16:57–59; Ex. 5 at 2:16:58–2:17:00.) As Seide opened Cobb's driver-side door, Cobb placed his foot on the brake,

moved his hand to the transmission shift, and shifted the car into drive. (Compl. ¶¶ 28–29; Ex. 2 at 2:16:59–2:17:03; Ex. 5 at 2:17:01–03.)

Cobb's car moved forward; Seide and Londregan moved with it. (Compl. ¶ 30; Ex. 1 at 2:16:59–2:17:03; Ex. 3 at 2:17:00–01.) Seide leaned inside the car and reached over Cobb toward his seatbelt buckle, in an attempt to remove Cobb from the car. (Compl. ¶ 31; Ex. 3 at 2:17:02–05; Ex. 5 at 2:17:03–04.) Seide was leaning at least half-way inside the car to accomplish this motion. (Ex. 3 at 2:17:02–05.) Cobb then stepped on the brake, stopping the vehicle's forward movement. (Compl. ¶ 32; Ex. 1 at 2:17:00–02; Ex. 3 at 2:17:02–03 (brake lights).)

Then the car began moving again, and Londregan pulled his firearm, pointed it at Cobb, and shouted, "Get out of the car now!" (Compl. ¶¶ 32, 34–35; Ex. 1 at 2:17:01–04 (no brake lights when Londregan shouts); Ex. 3 at 2:17:03–04 (same); Ex. 5 at 2:17:03–04.) While Londregan was shouting, Seide was still leaning inside the car trying to reach Cobb's seatbelt, as Cobb took his foot off the brake and the car began moving forward. (Compl. ¶ 35; Ex. 1 at 2:17:02–04; Ex. 3 at 2:17:03–04; Ex. 5 at 2:17:04–05.)

Londregan's body-worn camera video shows that Cobb raised his right hand from the gear shift. (Ex. 5 at 2:17:05.) Within tenths of a second after Londregan yelled the word "now," he fired his handgun twice at Cobb's torso, striking him twice. (Compl. ¶ 35; Ex. 1 at 2:17:03–04 (gunshots heard, brake lights off); Ex. 5 at 2:17:04–05.) The car was moving when Londregan shot Cobb.

After Londregan shot Cobb, Cobb's vehicle began to accelerate with Seide still partially inside the car. (Compl. ¶ 36; Ex. 1 at 2:17:04–05; Ex. 3 at 2:17:04–05.) Seide was dragged for a moment before he and Londregan fell away from the car. (Compl. ¶ 37; Ex. 1 at 2:17:04–08; Ex. 3 at 2:17:05–06; *see* Ex. 2 at 2:17:20–21 (Seide saying that he "got f***ing dragged").) Cobb's car continued onto Interstate 94 into traffic. (Compl. ¶ 38; Ex. 1 at 2:17:06–16.) The troopers ran to their squad cars and followed Cobb's car, which traveled about one-quarter mile down the interstate and slowed to a stop next to the median. (Compl. ¶ 39; Ex. 1 at 2:17:17–2:18:08.)

The troopers caught up with Cobb and significantly decelerated. Seide's squad car hit the rear-passenger side of Cobb's slowly moving car. (Ex. 1 at 2:18:07–08.) Londregan hit Cobb's car in the front passenger side. (*Id.* at 2:18:08.) Defendants and others pulled Cobb from the car and attempted life-saving measures, without success. (Compl. ¶ 40.)

Nyra Jean Miller-Fields, individually and as personal representative of Cobb's estate, sued Seide and Londregan, alleging claims under 42 U.S.C. Section 1983 for unreasonable seizure and for use of excessive force in violation of the Fourth and Fourteenth Amendments to the United States Constitution.[4] Londregan previously

---

[4] Only the Fourth Amendment applies here because Miller-Fields claims that Seide used excessive force, and so there was a "seizure." *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.").

moved to dismiss the claims against him, and the Court granted that motion. (ECF No. 78.) Seide now moves to dismiss the claims against him on the grounds of qualified immunity and for a failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**ANALYSIS**

## I.     Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the Court must accept as true all plausible factual allegations and draw all reasonable inferences for the non-moving party. *Smithrud*, 746 F.3d at 397. The Court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." *Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019) (citations omitted). And the Court will not accept "the plaintiff's version of the facts if they are 'blatantly contradicted' by video evidence." *Id.* (cleaned up, citation omitted). Miller-Fields argues that the Court cannot consider the video exhibits without converting the motion to dismiss into a motion for summary judgment. The Court disagrees. "Videos of an incident are necessarily embraced by the pleadings, and [the Court] will consider the videos here." *Ching*, 73 F.4th at 621; *see LeMay v. Mays*, 18 F.4th 283, 289–90 (8th Cir. 2021) (considering videos to assess whether a motion to dismiss should have been granted); *see also Crow v. Rasmussen*, No. 23-CV-2403 (KMM/TNL), 2024 WL 2014211, at *3 (D. Minn. May 7, 2024) ("Where their authenticity and completeness are not in dispute, the Eighth Circuit and courts from this District have routinely held

that body-worn videos like the ones here are 'embraced by the pleadings' and proper to consider on a motion to dismiss." (collecting cases)). The Court views undisputed video footage in the light depicted by the footage. *Scott*, 550 U.S. at 381. The Court will, of course, construe inconclusive video evidence in Miller-Field's favor. *Abdullah v. Lepinski*, No. 23-CV-121 (ECT/DTS), 2023 WL 5515895, at *2 (D. Minn. Aug. 25, 2023).

## II.    Qualified Immunity

Seide seeks dismissal of the unlawful seizure and excessive force claims against him on the grounds of qualified immunity. Qualified immunity provides some protection to government officials against suits for civil damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In a Section 1983 action, "an officer is entitled to qualified immunity unless: (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established." *Ching*, 73 F.4th at 620. To be a clearly established right, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1255 (8th Cir. 2023) (citation omitted). Miller-Fields need not identify "a case directly on point," but "controlling authority or a robust consensus of persuasive authority must put the constitutional question 'beyond debate.'" *Id.* (citation omitted). The "salient question" is whether the law at the time of the alleged violation gave Seide "fair warning" that his conduct was unconstitutional. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted).

A.    *Unreasonable Seizure*

Miller-Fields argues that Seide unreasonably seized Cobb when he: (1) extended the traffic stop to investigate the protective order; (2) attempted to arrest Cobb; (3) physically grabbed Cobb; and (4) rammed Cobb's vehicle with his squad car. (ECF No. 75 at 14; *see* Compl. ¶ 57(a)–(c), (g).) The Court addresses the first two bases below. Because the last two bases also underlie Miller-Fields' excessive-force claim, they are addressed separately.

To establish a Fourth Amendment violation, Miller-Fields must show that "a seizure occurred and that the seizure was unreasonable." *Dundon*, 85 F.4th at 1255. "Once the predicate facts are established, the reasonableness of the official's conduct under the circumstances is a question of law." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (citation omitted)).

*Extended traffic stop.* Miller-Fields concedes that the traffic stop was lawful at its inception, (ECF No. 75 at 14 n.5), but asserts that Seide impermissibly extended the stop to investigate the felony OFP violation. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015). "Whether the duration of the stop is reasonable is determined by the seizure's 'mission,' and law enforcement must be 'reasonably diligent' in carrying out that mission." *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021) (citing *Rodriguez*, 575 U.S. at 354, 357). An

officer may extend a traffic stop if he develops "reasonable suspicion of criminal activity," that is, if the officer has "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Allen*, 43 F.4th 901, 907 (8th Cir. 2022) (citation omitted). The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant further investigation." *Id.* at 907–08 (quotation marks and citation omitted); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968). The Court considers the totality of the circumstances in determining whether an officer had reasonable suspicion to extend a stop. *Id.* at 908.

Seide had reasonable suspicion that Cobb engaged in criminal activity warranting further investigation. The complaint acknowledges that Seide had reasonable suspicion that Cobb had a felony OFP violation. (Compl. ¶ 62 (alleging that neither Londregan nor Seide "had reasonable suspicion that Decedent Cobb had committed any crime *other than a protective order violation*" (emphasis added).) Seide had received the information alert reporting that Cobb was wanted for a "felony OFP violation"[5] and instructing officers to "hold subject and contact Ramsey County Sheriff's Office." (Ex. 2 at 1:59:06–26; *see* Compl. ¶ 13 (noting there was no outstanding arrest warrant).) "In deciding whether

---

[5] Under Minnesota's Domestic Abuse Act, a person who violates an OFP is guilty of a felony if the person violates the Act:

> (1) within ten years of the first of two or more previous qualified domestic violence-related offense convictions or adjudications of delinquency; or
> (2) while possessing a dangerous weapon . . . .

Minn. Stat. § 518B.01, subdiv. 14(d).

there is reasonable suspicion [to conduct a traffic stop], an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation." *United States v. Guzman*, 926 F.3d 991, 997 (8th Cir. 2019) (quotation marks and citation omitted). Seide then confirmed Cobb was the subject of the information alert. Based on the alert and positive identification of Cobb, Seide had articulable suspicion to justify reasonably extending the traffic stop for further investigation as to whether Cobb should be arrested for the OFP violation.

Miller-Fields argues that Seide unreasonably seized Cobb by extending the traffic stop longer than necessary to determine whether Cobb should be arrested, and by failing to act diligently in making this determination. She notes that Seide told Erickson he was "just sitting here buying time" while waiting for RCSO to contact him. (Ex. 2 at 1:59:01.) Seide expressed concern that Cobb would be suspicious about how long they were waiting to hear from RCSO, and asked Erickson to talk with Cobb to stall for time. (*Id.* at 2:09:56–2:10:49.) Miller-Fields contends that once Seide concluded there was a possible OFP violation, he continued to unreasonably delay the stop to ask if he should take Cobb to jail because the alert was unclear. (ECF No. 75 at 16–17.) She argues that Seide's concern about how long the OFP inquiry was taking shows that the inquiry took longer than necessary. (*Id.* at 17.)

"Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per se* time limit on all traffic stops." *United States v. Olivera-Mendez*, 484

F.3d 505, 510 (8th Cir. 2007). In assessing whether a detention is too long, courts consider whether the officer "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect]." *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (citation omitted). The videos show that Seide was reasonably diligent in carrying out his mission of determining whether Cobb should be arrested for the felony OFP violation. Seide first approached Cobb's car and asked him for his license and registration, informed him why he had been stopped, and asked where he was coming from. (Ex. 2 at 1:52:21–1:58:34.) Seide returned to his squad car, reviewed the information alert, confirmed that Cobb was the subject of the alert, and radioed dispatch to contact RCSO about Cobb, per the alert's instruction. Two minutes later, dispatch told Seide that a sergeant would contact him "shortly." (*Id.* at 2:04:35–44.) After waiting about nine minutes for RCSO to respond, he received that call. During the two-minute call, Seide confirmed that he was to arrest Cobb for a felony OFP violation and take him to Ramsey County Jail for booking. (*Id.* at 2:13:01–15:07.) The Court concludes that Seide acted diligently in confirming that Cobb was to be arrested for the OFP violation. *See United States v. Murillo-Salgado*, 854 F.3d 407, 416 (8th Cir. 2017) (concluding that a traffic stop was not unlawfully prolonged where the video recording of the 23-minute stop showed that the officer "spent that time asking permissible questions . . . , attempting to corroborate the responses to those questions, *placing calls to dispatch*, *waiting for responses* to verify [defendants'] identification and

13

criminal history, and entering information into the patrol car's computer" (emphasis added)). Miller-Fields suggests that Seide should have done something other than waiting for RCSO to contact him, but "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe*, 470 U.S. at 687.

Moreover, once Seide confirmed Cobb was to be arrested, he proceeded expeditiously. Within a few minutes, Seide exited his squad car, told the other troopers the plan, approached Cobb's car, repeatedly asked Cobb to step out of it, and finally told Cobb that he was under arrest. Miller-Fields cites no authority to suggest that the length of the stop—roughly 20 minutes by her count—was unreasonable. *Cf. Murillo-Salgado*, 854 F.3d at 416 (holding that a 23-minute traffic stop was not unlawfully prolonged).

*Attempted warrantless arrest.* Next, Miller-Fields argues that the seizure was unreasonable because Seide did not have probable cause to arrest Cobb. "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause" that a crime has been committed, and "an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (citation omitted). "Probable cause [for a warrantless arrest] exists when the facts and circumstances within an officer's knowledge are sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime." *Bernini v.*

*City of St. Paul*, 665 F.3d 997, 1003 (8th Cir.2012) (citing *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949).).

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Just v. City of St. Louis*, 7 F.4th 761, 767 (8th Cir. 2021) (citation omitted). Officers are afforded "substantial latitude in interpreting and drawing inferences from factual circumstances," and "where the officers act on a mistaken belief that probable cause exists, if that mistake is 'objectively reasonable,' arguable probable cause exists and the officers are entitled to qualified immunity." *Id.* (citations omitted).

Seide does not assert that he personally determined that probable cause existed to arrest Cobb. Instead, he maintains that he reasonably relied on the RCSO's probable-cause determination. "Generally, an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable." *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1010 (8th Cir. 2017).

As explained above, after Seide spoke with Cobb, he reviewed the information alert and confirmed Cobb's identity. Seide then asked dispatch to contact RCSO, and several minutes later, Seide received a call from RSCO.[6] The videos did not record the

---

[6] Miller-Fields also argues that Seide did not have probable cause because he did not immediately arrest Cobb upon reviewing the information alert. Seide decided to arrest Cobb after he spoke with RCSO, so the Court need not determine whether he could have

caller's words, but Seide's side of the conversation makes it clear that RCSO directed Seide to arrest Cobb and bring him to Ramsey County Jail.[7]

Seide told the caller that he had Cobb stopped in his vehicle; he did not mention arresting Cobb. After a pause—during which the Court reasonably infers that the caller was speaking—Seide said, "Alright, yeah," he would arrest Cobb, and asked what the caller "want[ed] to do for transport." After another pause, Seide responded, "Ramsey County Jail? I can do that. And then do you want me to meet a squad there? Or how do you want me to do booking? [pause] Yeah, I can book him under felony OFP." Seide requested the case number, wrote it down and repeated it, then stated, "I'll go arrest him, and then I'll bring him to Ramsey County Jail" and asked which case number to use. He paused a few more times, listening to the caller and responding, "ok," "yep," "sounds good." (Ex. 2 at 2:13:01–15:07 (also showing Seide writing on paper when repeating the case number); Ex. 1 at 2:13:00–15:05.) Seide then exited his squad car and told the other troopers that Ramsey County wanted Cobb arrested and brought to Ramsey County Jail.

---

arrested Cobb based solely on the alert. *See Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) ("Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" (citation omitted)).

[7] Miller-Fields argues that the one-sidedness of the conversation precludes dismissal because "[f]or all anyone knows, [Seide] may have been told that the 72 hours had just lapsed and announced he would arrest Cobb anyway." (ECF No. 75 at 24.) Having viewed the videos repeatedly, the Court declines to make this unreasonable inference.

He returned to Cobb's car and repeatedly asked Cobb to exit his car and give Seide the car keys. After Cobb disregarded his repeated orders, Seide tried to arrest Cobb.

The videos suggest that Seide reasonably relied on the RCSO's determination of probable cause to arrest Cobb. *See generally United States v. Williams*, 429 F.3d 767, 771–72 (8th Cir. 2005) (deciding that the collective knowledge of the investigative team "was imputed to the officer at the scene when he received [a sergeant's] radioed request" to stop a vehicle suspected of containing controlled substances). The complaint alleges no facts suggesting otherwise.

Miller-Fields argues that Seide did not have probable cause to believe that Cobb knew of the OFP. Minnesota's Domestic Abuse Act mandates an arrest for a felony OFP violation only if the officer has "probable cause that the person *knows* of the existence of the order."[8] Minn. Stat. § 518B.01, subdiv. 14(e) (emphasis added). During the call, Seide confirmed that Cobb was to be booked under "felony OFP," reasonably inferring the RCSO had made the required probable-cause determination, including Cobb's knowledge of the OFP. *See United States v. Briley*, 726 F.2d 1301, 1305 (8th Cir. 1984) ("Probable cause is based on the collective knowledge of all the officers involved."). Miller-Fields cites no authority suggesting that Seide had a duty to verify the RCSO's

---

[8] Minnesota's Domestic Abuse Act appears to mandate the arrest where probable cause is met: "[a] peace officer *shall* arrest without a warrant and take into custody a person whom the peace officer has probable cause to believe has violated an order [of protection] granted pursuant to this section . . . ." Minn. Stat. § 518B.01, subdiv. 14(e) (emphasis added).

probable-cause determination. *Cf. Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (en banc) (holding that an officer assigned to operate a battering ram "had no constitutional duty to verify" the supervising officer's decision to execute a no-knock entry based on "the settled principle that law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable" (collecting cases)); *see generally United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011) ("We have never required that all the relevant collective knowledge of the team be communicated to the officer who made the stop, the arrest, or the search at issue.").

Miller-Fields also contends that there are factual questions about whether probable cause to arrest existed. She argues that discovery is needed on various fact issues, including: (1) the identity of the dispatcher and RCSO caller; (2) what was said in the conversations between Seide, dispatch, and RCSO; (3) the OFP terms; (4) the alleged OFP violation, including when it allegedly occurred; and (5) whether Cobb was aware of the OFP. (ECF No. 75 at 19.) The Court finds such discovery to be unnecessary. *See Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017) ("Probable cause is a question of law that is determined at the moment the arrest is made, and 'any later developed facts are irrelevant to the probable cause analysis.'" (citation omitted)). The video recordings amply support that Seide had arguable probable cause to arrest Cobb because Seide reasonably relied on the RCSO's probable-cause determination, even if that probable-cause determination was mistaken. *See Just*, 7 F.4th at 767–68. At a minimum, the Court

concludes that even if Seide were "mistaken that probable cause existed, that mistake was 'objectively reasonable' and arguable probable cause exists, entitling [him] to qualified immunity." *Id.* at 768 For these reasons, Seide is entitled to qualified immunity on these unreasonable seizure claims.

*Clearly established right.* Even if Miller-Fields alleged a constitutional violation, Seide is entitled to qualified immunity because his conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. "An officer violates a clearly established right only if a reasonable officer in the same position would understand his conduct violates the right." *Ching*, 73 F.4th at 620. The Court "must not 'define clearly established law at a high level of generality.'" *Id.* (citation omitted). In determining whether Miller-Fields identified a clearly established right, the Court "look[s] for a controlling case or a robust consensus of cases of persuasive authority that involves sufficiently similar facts to squarely govern the conduct at issue and places the question beyond debate." *Id.* (quotation marks omitted) (citing *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). "The plaintiff bears the burden of proving that the law was clearly established." *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013).

As noted above, Miller-Fields has not cited any authority with "similar facts" that hold "beyond debate" that Seide violated a clearly established rights when he extended the traffic stop or attempted to arrest Cobb. *Ching*, 73 F.4th at 620. Instead, she cites

caselaw for general propositions, such as that a warrantless arrest unsupported by probable cause violates the Fourth Amendment. (ECF No. 75 at 23–24.) This does not suffice: "[a] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kruger v. Nebraska*, 820 F.3d 295, 302 (8th Cir. 2016) (citation omitted) (affirming grant of motion to dismiss because right was not clearly established).

Miller-Fields also cites Minnesota's felony OFP statute, which requires that an officer have probable cause to arrest for a felony OFP violation, including probable cause that the party knew of the existence of the OFP. Minn. Stat. § 518B.01, subdiv. (14)(e). But she cites no authority clearly establishing that an arresting officer must personally confirm with the party that the party knew of the OFP, even where the officer received an alert and confirmed with the related law enforcement agency that the party was to be arrested for a felony OFP violation. *Cf. Doran*, 409 F.3d at 965 (holding that an officer "had no constitutional duty to verify" the supervising officer's decision to execute a no-knock entry because "officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable"). This proclaimed duty is not clearly established.

Because Seide did not violate any clearly established rights by extending the traffic stop or attempting to arrest Cobb at the time of the alleged violations, the Court grants

Seide's motion to dismiss the unreasonable-seizure claims based on qualified immunity. *See Story v. Foote*, 782 F.3d 968, 973 (8th Cir. 2015) (affirming dismissal of § 1983 claims because the purported right was not clearly established when plaintiff cited "no supporting case with analogous facts").

### B.    *Excessive Force*

Miller-Fields also asserts unreasonable-seizure and excessive-force claims against Seide for (1) grabbing and attempting to wrestle Cobb out of his car and (2) "ramm[ing]" Cobb's car with Seide's squad car. (Compl. ¶¶ 57(c), 57(g), 77–78, 80.) The analysis is similar to the analysis of unreasonable seizure: "Claims that an officer seized a person with excessive force 'are properly analyzed under the Fourth Amendment's objective reasonableness standard.'" *Arnold v. McClinton*, 112 F.4th 598, 602 (8th Cir. 2024) (citing *Wallace v. City of Alexander*, 843 F.3d 763, 768 (8th Cir. 2016)). In determining whether a particular use of force was objectively reasonable, courts consider the circumstances of each case, including "the severity of the crime at issue," whether the suspect "is actively resisting arrest or attempting to evade arrest by flight," and "whether the suspect poses an immediate threat to the safety of the officer or others." *Wertish v. Krueger*, 433 F.3d 1062, 1066 (8th Cir. 2006) (citation omitted).

The complaint alleges that "Cobb was an unarmed man stopped for a minor traffic violation, had no outstanding warrants, and was not threatening or acting violently towards the officers on scene." (Compl. ¶ 77; *see also id.* ¶¶ 57(a)–(d) (alleging unlawful

seizure based on similar factual allegations).) It also alleges that Seide and Londregan neither attempted any de-escalation techniques nor attempted to determine whether Cobb was armed or posed any danger to himself or others before Seide attempted to wrestle Cobb out of the car and hit Cobb's car with his squad car. (*Id.* ¶¶ 79–80.) The video recordings establish a different fact pattern.

First, Cobb's initial traffic stop was for a minor traffic violation. But by the time of Seide tried to extract Cobb from his car, it was no longer merely a traffic stop: it was an arrest based on Cobb's alleged felony OFP violation, which mandates arrest under Minnesota law. Minn. Stat. § 518B.01, subdiv. 14(e). The situation was thus far more serious than a traffic stop.

Second, Cobb ignored Seide's repeated requests for him to exit the car and give up the car keys—an uncooperative response to Seide's attempts at de-escalation. Relatedly, the videos show that when Seide told Cobb that he was under arrest, Cobb took steps that an officer would reasonably believe were an attempt to flee: he shifted the gears of his car from park into drive, and the car began moving forward. Miller-Fields argues that Cobb was not physically resisting arrest. (ECF No. 75 at 26–27.) The Court thinks otherwise; fleeing an arrest in a motor vehicle can certainly be characterized as physical resistance to arrest. Cobb took action to flee the scene immediately after Seide told him that he was executing a lawful arrest. The troopers were not required to discern Cobb's motivations for shifting the car into drive. *See Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir.

2018) ("Law enforcement officers are not required to read a suspect's motivations in failing to obey commands—it is enough that the officer reasonably perceives that the suspect is not following orders as given.").

Third, as for whether Cobb posed an immediate threat to the others' safety, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1105 (8th Cir. 2004) (citing *Graham*, 490 U.S. at 396–97). Miller-Fields argues that Cobb was not fleeing, but instead was startled by Londregan's entry into his car, causing his foot to move off the brake. (ECF No. 75 at 27.) This again is controverted by the video evidence, which shows Cobb shifting the car's gear into drive with his hand. Even if Cobb "actually posed no danger," the Court is only to consider "*objective* reasonableness based on the circumstances at the time." *Ransom v. Grisafe*, 790 F.3d 804, 812 (8th Cir. 2015). Given all of the factors present, it was objectively reasonable for Seide to view Cobb's actions as an immediate threat to the safety of Londregan and the motorists on the highway.

*Grabbing and attempting to wrestle Cobb.* Miller-Fields next contends that by reaching into the car and "grabb[ing]" and "attempt[ing] to wrestle Decedent Cobb out of the vehicle," Seide effectuated an illegal seizure and use of excessive force. (Compl. ¶¶ 57(c), 77.) Officers may use reasonable force to remove a driver who disregards orders

to exit a car, particularly where they are affecting a lawful arrest. *See Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) ("Police officers undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a lawful seizure."); *Wertish*, 433 F.3d at 1066–67 (8th Cir. 2006) ("When a suspect is passively resistant, somewhat more force may reasonably be required. [Plaintiff] would not exit the truck, so it was reasonable to pull him out and take him to the ground."); *Foster v. Metro. Airports Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990) (concluding that an officer's use of force to pull a suspect from his car and handcuff him was reasonable after he resisted the request to get out of a car). The videos show that Seide leaned into Cobb's car and reached over Cobb toward his seatbelt only after Cobb ignored multiple requests to exit the car and give Seide the car keys, and after Seide told Cobb he was under arrest. The Court concludes that Seide acted objectively reasonably in attempting to extract Cobb from his car.

*"Ramming" Cobb's car.* Miller-Fields also alleges that Seide unreasonably seized and used excessive force against Cobb by "ramming" his stopped car after the shooting. (Compl. ¶¶ 57(g), 80.) The videos show no such "ramming." Instead, they show that Seide's squad car decelerated as it approached Cobb's slowly moving car before bumping it to a stop. (Ex. 1 at 2:17:58–2:18:10.)

Courts have found no violation of the Fourth Amendment when officers used squad cars to hit a suspect's vehicle to box in the suspect, because a reasonable officer could have believed that the suspect was fleeing from officers and threatened the safety

of others unless they were stopped. *See, e.g.*, *Jackson v. Brooklyn Ctr.*, No. 21-CV-2072 (SRN/DJF), 2023 WL 2368032, at *11 (D. Minn. Mar. 6, 2023), *aff'd*, No. 23-1678, 2023 WL 6876550 (8th Cir. Sept. 28, 2023); *Nunn v. City of Woodbury*, No. 05-CV-632 (ADM/JSM), 2006 WL 3759748, at *8 (D. Minn. Dec. 21, 2006) ("In the totality of the circumstances, [the officer's] actions of ending the pursuit by pushing [the suspect's] car into a snow bank after hitting [the suspect's] almost-stopped car with his squad car traveling approximately twenty miles per hour was objectively reasonable."). At the time Seide's squad car hit Cobb's car, Seide had at least arguable probable cause to arrest Cobb for the felony OFP violation, as well as for resisting arrest, Minn. Stat. § 609.50, subdiv. 1(1)–(2), and for fleeing arrest in a motor vehicle. Minn. Stat. § 609.487, subdiv. 3. In addition, given the close-range gun shots, it is reasonable to infer that Seide believed that Cobb was wounded, so Cobb's continued driving could be a danger to himself or the public. (*See* Compl. ¶ 78 (alleging that Seide rammed Cobb's car "despite . . . Cobb's gunshot wounds").) Given these facts, the Court finds that Seide's use of his squad car to stop Cobb's car was not objectively unreasonable.

*Clearly established right.* "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 992 (8th Cir. 2020) (citing *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). "This means that the right in question

must be construed fairly narrowly and that facts in the present case must align with facts in precedent." *Rusness v. Becker Cnty.*, 31 F.4th 606, 615 (8th Cir. 2022) (citation omitted). Miller-Fields offers no factually similar case for her attempt-to-wrestle claim. As for her "ramming" claim, Miller-Fields argues that the law is clearly established that officers may not use force against an "incapacitated individual." (ECF No. 75 at 31.) None of the cases she cites involve an officer using a squad car to hit an individual's car after the individual fled and was likely incapacitated while driving a vehicle.[9] Miller-Fields has failed to show that either excessive force claim violated a clearly established right. Indeed, under the case law cited above, Seide did not violate a clearly established right when he "attempted to wrestle" with Cobb and hit Cobb's car with his squad car.

For these reasons, the Court concludes that Seide is entitled to qualified immunity for Miller-Fields' unreasonable seizure and excessive force claims.

---

[9] The cases Miller-Fields relies on involve very different factual scenarios; none involve vehicles. *See Madison v. City of Minneapolis*, No. 02-CV-4257 (JRT/FLN), 2004 WL 1630953, *6 (D. Minn. July 15, 2004) ("[G]ratuitously kicking plaintiff after plaintiff was on the floor, was clearly injured, and presented no further threat to the officers would be objectively unreasonable and present a violation of the Fourth Amendment."); *Est. of Jones by Jones v. City of Martinsburg*, 961 F.3d 661, 669 (4th Cir. 2020) (alleging plaintiff was tased multiple times, hit, kicked, and placed in a choke hold); *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) ("Any reasonable officer should have known that holding an infant at gunpoint constituted excessive force."), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012)).

**CONCLUSION**

Based on the above and on all the files, records, and proceedings herein, Brett

Seide's motion to dismiss (ECF No. 61) is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: January 21, 2025                    BY THE COURT:

                                           s/Nancy E. Brasel
                                           Nancy E. Brasel
                                           United States District Judge